Bennie **VITALE, and Anna Vitale, Appellants,**

v.

The **AETNA CASUALTY & SURETY COMPANY, Appellee.**

No. 85–1203.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1986.

Decided March 16, 1987.

Rehearing and Rehearing En Banc Denied May 8, 1987.

William L. Turner, Kansas City, Mo., for appellants.

R. Frederick Walters, Kansas City, Mo., for appellee.

Before McMILLIAN and JOHN R. GIBSON, Circuit Judges, and MURPHY,* District Judge.

* The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota, sitting by designation.

DIANA E. MURPHY, District Judge.

This case concerns insurance claims made after fire destroyed a Kansas City restaurant owned by members of the Vitale family. Bennie and Anna Vitale[1] and their sons, Paul and Vincent Vitale,[2] brought a number of claims against Aetna Casualty and Surety Co., including breach of a fire insurance policy and vexatious refusal to pay. Aetna asserted arson and fraud as defenses. Some counts, including Vincent's claims, were dismissed before and during trial. The three remaining damage claims were submitted to a jury: the claim of Bennie and Anna on loss of the building and separate claims by Bennie and Paul on the building's contents. The jury returned a defense verdict on all counts, and judgment was entered in favor of Aetna. On appeal, Bennie and Anna Vitale contend that the trial court[3] erred in giving certain instructions to the jury and in ruling on two motions.[4] We affirm.

I.

The facts are stated in the light most favorable to Aetna, which prevailed at trial. See, e.g., Wilmington v. J.I. Case Co., 793 F.2d 909, 914 (8th Cir.1986). Bennie Vitale owned three barbecue restaurants in the Kansas City area. Two of his children, Paul and Vincent, worked at the restaurants from childhood and began managing the restaurants after graduating from high school. In 1978 or 1979, Bennie informally gave a restaurant to each of his sons: The Vineyard Restaurant to Vincent and Benny's Bar–B–Q, also known as Benny's Inter-City Bar–B–Q or the Old Plantation

Bar–B–Q, to Paul. Bennie continued to manage the third restaurant, Benny's North Kansas Bar–B–Q, until 1983.

A fire destroyed Benny's Bar–B–Q on June 13, 1982. On that Sunday morning, Robert Warrene, a worker in an adjacent building, saw smoke drifting from Benny's Bar–B–Q. As he watched, flames leapt from the roof and two men emerged from the back door. One of the men was 5′ 8″ or 5′ 9″ and 200 to 220 pounds; Warrene later identified Paul Vitale as that man. The other man was taller, slimmer and carried a fire extinguisher; Aetna asserts that he was Vincent Vitale. Aetna argued that Paul, and possibly Vincent, had intentionally set fire to the building.[5] There was substantial evidence of arson. Appellants do not suggest that anyone other than their sons might have set the fire.

Bennie and Anna had purchased the building which housed Benny's Bar–B–Q only two months before the fire, after its owner died. They were able to purchase it for only $27,000, far less than its approximate $100,000 value, because Paul had a very favorable lease for its use. Bennie and Anna put $6,000 down on the building and took a $21,000 mortgage from the Blue Ridge Bank and Trust. Vincent, who managed insurance matters for the entire family, arranged to add their names to the insurance policy on the building, insuring it for $92,000.

Paul ran the restaurant and over a period of years borrowed money to improve it from Blue Ridge Bank and Trust. Bennie guaranteed the most recent of these loans, which consolidated the previous ones; the

---

1. Bennie and Anna Vitale were divorced before trial. Anna was not present at trial because she was recovering from a heart attack.

2. The original plaintiffs were Paul Joseph Vitale d/b/a Benny's Bar–B–Q, Vincent C. Vitale, Bennie Vitale, Anna Vitale, the Vineyard, Inc., and Benny's Bar–B–Q, Inc. Bennie Vitale's name sometimes appears as Benny. The record is not entirely clear, but it appears that no claims were submitted on behalf of the corporations.

3. The Honorable Joseph E. Stevens, Jr., United States District Judge for the Western and Eastern Districts of Missouri.

4. Paul and Vincent Vitale have not appealed.

5. Paul testified that he had been alone in the restaurant preparing food, that he saw thick smoke coming from the barbeque pit, and that he left the building through the rear door when his efforts to extinguish the fire failed. Vincent testified that he was asleep at home when the fire began, that an anonymous caller told him of the fire, and that he drove to the scene of the fire, where Paul told him what had happened. In a previous sworn statement, however, Vincent stated that he had not been to the restaurant at all on the day of the fire. Both men had keys to the restaurant.

contents of the building served as collateral. Vincent incorrectly thought that he was also liable on the $50,000 consolidated loan from the bank.[6] Bennie claims that he no longer had any part in the ownership or management of his sons' restaurants at the time of the fire. The evidence indicates, however, that the utility bills for Benny's Bar–B–Q remained in Bennie's name. Vincent Vitale, who had the authority to sign anything in Bennie's name, signed his father's name to 1979, 1980 and 1981 liquor license applications indicating that Bennie owned both Benny's Bar–B–Q and The Vineyard.

Bennie and Paul Vitale had suffered financial difficulties shortly before the fire. At the time of the fire, Benny's Bar–B–Q was behind on its utility bills and on loan payments. It had lost money in 1981 and 1982. Paul had written a substantial number of checks on both his personal and business accounts which were returned for insufficient funds. He was also behind on his house payments. Bennie had recently suffered a substantial decrease in his income. In short, there was evidence of motive for arson.

Ten days after the fire, Aetna cancelled policies on all of the Vitales' businesses for "underwriting reasons." The same day, Aetna adjustor William Franz sent a proof of loss form to Vincent. Vincent contacted attorney Tom Cox, who completed the form. The first proof of loss stated that Paul and Vincent owned the business and that Bennie and Anna owned the building. The questions relating to loss, damage, and claim were answered incompletely or not at all. Vincent signed the form on behalf of all the insureds.

A second attorney, Ted Mullen, completed an amended proof of loss, which stated that the damage had been caused by a "fire in Bar–B–Q oven causing overheating and/or escaped." It further stated that Paul Vitale or Benny's Bar–B–Q, Inc. owned the personal property and business operation and that Bennie and Anna Vitale owned the building. The claim sought $92,000 for the building, $51,126.15 for its contents, and $100 per day for business interruption.[7] Only Vincent signed the amended proof of loss, but Bennie testified that he reviewed and approved the proof of loss before it was filed with Aetna and that it was, to the best of his knowledge, true. Bennie, Anna, and Paul had all authorized Vincent to complete and sign the proofs of loss.

On October 22, 1982, Aetna refused to accept the amended proof of loss. Its stated reasons included the suspicion that the fire had been intentionally set and the conclusion that some of the claim figures were fraudulent and unsupported by the necessary documents and calculations.

The Vitales brought this action on June 13, 1983. On January 30, 1984, Paul and Vincent sought voluntarily to dismiss their claims and Bennie and Anna sought to amend their complaint. The trial court denied these motions in relevant part. The court also denied the Vitales' subsequent motion to amend the complaint to add a claim for prima facie tort. In the course of the trial, the court directed a verdict for defendant on Vincent's claims because he had no insurable interest and also on the claims for vexatious refusal. In addition, the court determined that Missouri law did not bar an innocent co-insured from recovering for damages resulting from a co-insured's arson.

After seven days of trial, the jury returned three general verdicts, finding for Aetna against Bennie on his claim on the

---

**6.** There was conflicting testimony concerning the extent to which the brothers kept their businesses separate. At various times, Paul and Vincent said they were partners, had been partners, or had discussed becoming partners. Both also stated that the restaurant was owned by Benny's Bar–B–Q, Inc., of which Paul was president and Vincent vice president. At other times they stated that no such corporation existed or that they were not officers of it. Vincent had signed the $50,000 loan as an officer of Benny's Bar–B–Q, Inc., but was not personally liable on it. It is undisputed that he did not work at Benny's Bar–B–Q, receive any income from it, or share the risk of operating it.

**7.** Paul Vitale initially sought damages for business interruption, but subsequently amended the complaint, dropping that claim.

contents of the building, against Bennie and Anna on their claim on the building, and against Paul on his claim on the contents. The court denied post-trial motions brought by Bennie and Anna for judgment notwithstanding the verdict or a new trial and by Paul for a new trial.

## II.

Appellants' primary arguments challenge the jury instructions on fraud.[8] Bennie and Anna argue that the trial court erred in giving instructions which allowed the jury to base a verdict against them on Vincent's fraudulent statements. The record does not indicate that they proposed

8. Instructions 20 through 24 concerned Bennie's claim for damages to the contents of the resturant; 21, 22 and 23 explained the fraud defense to this claim. Instructions Instructions 26 through 30 concerned the joint claim of Bennie and Anna for damages to the resturant building; 27, 28 and 29 explained the fraud defense to this claim. Instructions 31 through 39, which concern Paul's claim for for damages to the contents of the building and the arson and fraud defenses to this claim, are not at issue before this court.

9. The Vitale parents did argue to the trial court that there was insufficient evidence to support the misrepresentation defense to their claims. They asserted that any misrepresentation was both outside the scope of Vincent's agency and adverse to the interests of his parents. They also appear to have argued that any alleged misrepresentations were not material to them. We consider these claims, also made on appeal, below.

10. Instruction 27, concerning the claim of Bennie and Anna for damages to the building, stated, in relevant part:
Your verdict must be for defendant and against plaintiffs Bennie Vitale and Anna Vitale on their claim for insurance benefits for damage to the building itself, if you believe:
First, Vincent C. Vitale was an agent of Bennie Vitale and Anna Vitale for purposes of completing, signing and filing the amended proof of loss and Vincent C. Vitale was acting within the scope and course of his agency for Bennie Vitale and Anna Vitale when he completed, signed and filed the amended proof of loss, and
Second, Vincent C. Vitale, as agent for Bennie Vitale and Anna Vitale, in the amended proof of loss represented that the fire did not originate by any act, design or procurement of Bennie Vitale, Anna Vitale, Vincent C. Vitale, or Paul Joseph Vitale, or
Vincent C. Vitale, as Bennie Vitale's and Anna Vitale's agent, in the amended proof of

alternative instructions on fraud to the trial court, however, and they do not now offer any.[9] Their central argument is that they cannot be held responsible for Vincent's alleged "arson/fraud" without a showing of their "participation, knowledge and consent."

The court instructed the jury to find for Aetna on the claims of Bennie and Anna if it found that Vincent was acting as their agent when he completed the amended proof of loss and that he knowingly misrepresented the cause of the fire [10] or materially misrepresented the business interruption damages.[11] According to the instructions,

loss represented the cause and origin of the fire as overheated oven and/or escaped fire from the barbecue pit, and
Third, the representation was false, and
Fourth, Vincent C. Vitale knew that it was false or did not know whether it was true or false, and
Fifth, the representation was material, and
Sixth, Vincent C. Vitale intended to deceive the defendant.
Instruction 21, concerning Bennie Vitale's claim for damages to the building contents was essentially identical to 27. Instruction 21 required actual knowledge of falsity, however, rather than the alternative presented in instruction 27—"knew that it was false or did not know whether it was true or false."

11. Instruction 29 states in relevant part:
Your verdict must be for defendant and against plaintiffs Bennie Vitale and Anna Vitale on their claim for insurance benefits for damage to the building itself, if you believe:
First, that Vincent C. Vitale was an agent of Bennie Vitale and Anna Vitale for purposes of completing, signing and filing the amended proof of loss, and Vincent C. Vitale was acting within the scope and course of his agency for Bennie Vitale and Anna Vitale when he completed, signed and filed the proof of loss, and
Second, Vincent C. Vitale, as agent for Bennie Vitale and Anna Vitale, in the amended proof of loss represented the proof of loss business interruption damages as $100.00 per day, and
Third, the representation was false, and
Fourth, Vincent C. Vitale knew that it was false or did not know whether it was true or false, and
Fifth, that representation was a material exaggeration, and
Sixth, Vincent C. Vitale intended to deceive defendant.
Instruction 23, which concerns Bennie's claim for damages to the building contents, is essentially identical to 29.

Vincent was acting within the "scope of [his] agency" for Bennie and Anna if he submitted the proof of loss to serve their interests and they either controlled, or had the right to control, his conduct.[12]

■ Under Missouri law, "[a]ny fraud perpetrated by the agent on a third party in the course of his employment, and for the benefit of the principal, must be imputed to the principal, whether or not the latter had actual knowledge." *Tietjens v. General Motors Corp.*, 418 S.W.2d 75, 84 (Mo.1967) (quoting *Darks v. Scudders-Gale Grocer Co.*, 146 Mo.App. 246, 130 S.W. 430, 437 (1910)). Thus, the principal need not authorize or know of the fraud to be held responsible for it. *Phipps v. Mallory Commission Co.*, 105 Mo.App. 67, 78 S.W. 1097, 1098 (1904).

Appellants argue that this common principle of agency law is inapplicable where an insurer asserts that an insured has fraudulently concealed arson. "Arson/fraud" is a single defense, they argue, and the standard for attribution to a principal is the recognized standard for imputation of arson. That is, "a defense of arson ... will not operate to defeat recovery under a fire insurance policy where there has been no finding of knowledge, authorization or ratification of such burning by the insured." 18 G. Couch, *Cyclopedia of Insurance Law* § 74:671 at 991 (M. Rhodes 2d rev. ed. 1983). *See also Owl & Turtle, Inc. v. Travelers Indemnity Co.*, 554 F.2d 196 (5th Cir.1977). *Garrison v. United States Fidelity & Guaranty Co.*, 506 S.W.2d 87, 88 (Mo.App.1974) (insurer asserting defense of arson must show "that the fire was intentionally set for the purpose of burning the ... property by a person ... acting for and with the knowledge of" the insured).

This argument rests on appellants' assertion that "arson/fraud" is a single defense and that it is accordingly improper to "differentiate fraud in concealing arson from that in committing it." Appellant's Brief at 19. But the Vitales provide no authority to support their theory. While it is true that most courts have not made this distinction, the facts of most cases have not required it; none of the cited authority suggests that the distinction is improper. *See, e.g., Hosey v. Seibels Bruce Group*, 363 So.2d 751, 753 (Ala.1978) ("neither the arson nor the fraud of Mrs. Hosey in filing a false proof of loss statement precludes recovery by [innocent co-insured] Mr. Hosey"); *Home Insurance Co. v. Cohen*, 357 S.W.2d 674 (Ky.1962) (arson and false swearing of son of innocent co-insureds did not bar their recovery on policy where he did not perform either act in the course of his agency). Moreover, at least one court has expressly distinguished between the defenses of arson and false filing. *See Zemelman v. Boston Insurance Co.*, 4 Cal. App.3d 15, 84 Cal.Rptr. 206, 208 (1970).

■ Aetna's defense to the claims of Anna and Bennie was not arson, but fraud in the filing of an insurance claim. This defense is consistent with the language of the policy, which provides that recovery is barred where the insured "wilfully conceals or misrepresents any material fact or circumstance concerning the insurance or the subject therein, or in the case of any fraud or false swearing by the insured relating thereto." Joint Appendix at 388. It is also consistent with the Missouri law, which bars an insured who makes a fraudulent claim from recovering anything under the insurance contract. *Arel v. First National Fire Insurance Co.*, 195 Mo.App. 165, 190 S.W. 78, 80–81 (1916); *Hall v. Western Underwriters' Ass'n.*, 106 Mo.App. 476, 81

---

**12.** Instruction 28 provided that:

Acts of Vincent C. Vitale when completing, signing, and filing the amended proof of loss were within the "scope and course of agency" as that phrase is used in these instructions if,

1. They were performed by Vincent Vitale to serve the interests of Bennie Vitale and Anna Vitale according to an express or implied agreement with Bennie Vitale and Anna Vitale, and

2. Bennie Vitale and Anna Vitale either controlled or had the right to control the conduct of Vincent C. Vitale when he completed, signed and filed the amended proof of loss.

Instruction 22, concerned Bennie's claim on the building contents, but was otherwise identical.

S.W. 227 (1904). Public policy also favors holding insureds responsible for fraudulent insurance claims made for them by agents. If the principal cannot be held accountable, an insured could simply delegate responsibility for submitting the proof of loss to a third party whose misconduct could then be disavowed. *Harold J. Warren, Inc. v. Federal Mutual Insurance Co.*, 386 F.2d 579, 582 (1st Cir.1967) (under Massachusetts law, agent's fraudulent claim barred principal's recovery on policy); *See also Zemelman v. Boston Ins. Co.*, 4 Cal. App.3d 15, 84 Cal.Rptr. 206, 207 (1970) (where partner's fraudulent claim was "done within the scope of his authority as a copartner, ... the partnership is bound to accept the legal consequences...."). The instructions properly stated the general standard for imputing insurance fraud to a principal.

The Vitales argue, however, that the instructions improperly punished "innocent co-insureds" for the misdeeds of another insured. This misreads the trial court's rulings and the doctrine of the innocent co-insured. The trial court correctly ruled that the misconduct of one insured does not bar recovery by an innocent co-insured under the same policy. The Missouri Supreme Court has never reached this issue, but this court has in a decision rendered after trial of this case. *Haynes v. Hanover Insurance Cos.*, 783 F.2d 136 (8th Cir. 1986) (innocent spouse not barred from recovery by husband's misrepresentations to insurer). The *Haynes* court stated that:

> the better view and the position more likely to be adopted by the courts of Missouri when the question is addressed is expressed in the * * * line of authority permitting recovery by an innocent co-insured. * * * * [M]isconduct voids only the wrongdoer's interest in the insurance

policy and does not operate to defeat the separate interests of an innocent co-insured.

*Id.* at 138. *See also Plinsky v. Germania F. & M. Ins. Co.*, 32 F. 47, 50 (C.C.D.Mich. 1887) ("[T]he wife is not chargeable with the fraudulent conduct [arson] of her husband, notwithstanding he may have been her agent in the management of the property and the conduct of her business.") *quoted with approval, Walker v. Phoenix Insurance Co.*, 62 Mo.App. 209, 219 (1895); *Ryan v. MFA Mutual Insurance Co.*, 610 S.W.2d 428, 434–437 (Tenn.Ct.App.1980) (reviewing new "dominant line of authority" permitting innocent co-insured to recover).[13]

■ Anna and Bennie were not barred from recovering at trial if Paul or Vincent alone committed arson or fraud. The jury was instructed to consider whether any fraudulent filing by Vincent should be imputed to them. Not every fraudulent claim made in the name of an insured bars that insured from recovering under the policy. Rather, the evidence must show that the party making the claim acted within the scope and course of the agency and to serve the interests of the principal.[14] *See, e.g., Home Insurance Co. v. Cohen*, 357 S.W.2d 674, 676–77 (Ky.1962) (innocent co-insureds not barred from recovering where their son, the manager of their store and their agent for other purposes, made false statements to the insurer); *Giacobetti v. Insurance Placement Facility*, 457 A.2d 853 (Pa.1983) (where co-trustee filed fraudulent claim on behalf of trust, other trust beneficiaries could recover their shares since evidence did not show that he acted as their agent).

Similarly, where guilty and innocent parties file a joint claim containing fraudulent

---

**13.** *Haynes* and the other authority on innocent co-insureds suggest that the interests and claims of Anna and Bennie perhaps should have been considered individually. Appellants did not raise this issue in the trial court or on appeal, however.

**14.** If another party is injured by an agent's fraud, the principals may be liable even if the fraud is not to their benefit. *See, e.g., Rosebud Sioux Tribe v. A & P Steel, Inc.*, 733 F.2d 509,

518 (8th Cir.), *cert. denied* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Farm Bureau Co-op. Mill & Supply, Inc. v. Blue Star Foods, Inc.*, 238 F.2d 326, 335 (8th Cir.1956) ("where one of two innocent parties must suffer the consequences of the fraud of a third party, he who made the fraud possible must bear the loss * * *."); *Weaver v. Metropolitan Life Ins. Co.*, 545 F.Supp. 74, 77–78 (E.D.Mo.1982). This case does not present such a situation.

assertions, the innocent co-insured is not ordinarily bound by them. *See e.g., Fellman v. Fireman's Fund Insurance Co.,* 735 F.2d 55, 59 (2d Cir.1984); *Fuston v. National Mutual Insurance Co.,* 440 N.E.2d 751 (Ind.App.1982); *St. Paul Fire and Marine Insurance Co. v. Molloy,* 433 A.2d 1135, 1142 (Md.1981). *See also* 18 G. Couch, *Cyclopedia of Insurance Law* § 74:672 at 991 (M. Rhodes 2d rev. ed. 1983) ("Since the acts, even though evincing fraud or design, must be connected with the insured, it is not sufficient that they are the willful or fraudulent acts of his servants or agents, if the insured is neither expressly nor impliedly a party thereto, and the acts have been done without his procurement, privity or assent.") (footnote omitted).

Whether the fraudulent acts of an alleged agent void the insured's interest in a policy depends on the particular facts of the case. In *Cohen* and *Giacobetti,* the evidence was insufficient to support the insurer's theory that the fraudulent statements should be imputed to the innocent insureds. In the instant case, however, the trial court correctly found the evidence sufficient to submit the agency theory to the jury. In light of the instructions,[15] the jury's verdict means that it found that Vincent had filed the fraudulent claim while acting as his parents' agent and to serve their interests.

■ According to appellants, the jury could not properly have found that Vincent filed the fraudulent claim to serve his parents' interests. They argue that there was no evidence to suggest that the alleged misrepresentation served anything other than the adverse interests of Paul or Vincent Vitale. Under Missouri law, "where an agent, although ostensibly acting in the

business of the principal, is really committing a fraud, for his own benefit, he is acting outside of the scope of his agency." *Thomson-Houston Electric Co. v. Capitol Electric Co.,* 65 F. 341, 343 (6th Cir.1894), *quoted with approval Farm Bureau Cooperative Mill & Supply v. Blue Star Foods,* 238 F.2d 326, 335 (8th Cir.1956). Although this limitation on agency principles is implicit in instructions 22 and 28, it is not as clear as it might have been.

The trial transcript suggests that a reasonable jury might have reached at least two different conclusions: that Vincent filed the fraudulent claim to further the collective interests of his family or that he did so to further his own interest and that of his brother, without regard to the effect on his parents. In a case such as this, where the agent may have his own motives for committing the alleged fraud, it would be appropriate to instruct that a fraud committed entirely for the agent's benefit should not be attributed to the principal, absent actual injury to the defrauded third party. *See Farm Bureau Co-operative,* 238 F.2d at 335. Innocent co-insureds should not be barred from recovery because they delegate the completion of a proof of loss to an agent who then lies entirely for his own benefit or that of a third person. Appellants did not request such an instruction, however, and the evidence supports the jury's determination that the fraud was committed to serve appellants' interests.

■ The Vitales also argue that Aetna's defense should fail because the alleged misrepresentations were not material to their claims. Aetna asserted that the Vitales misrepresented both the cause of the fire and the extent of Paul's business interruption losses. The Vitales argue that they

---

**15.** The instructions, see notes 9–12 *supra,* focused on whether Vincent was acting as his parents' agent when he completed, signed, and filed the amended proof of loss. The instructions could have asked the jury to consider more specifically whether Vincent made the fraudulent statements in the course of his agency and to serve his parents' interests. *See* p. 15, *infra.* Appellants did not, however, request such an instruction, and its omission does not "seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings." *Rowe Int'l, Inc. v. J–B Enters. Inc.,* 647 F.2d 830 (8th Cir.1981). Use of special verdict questions would have been helpful in this case, even though no party appears to have requested them. *See, e.g. Bone v. Refco, Inc.,* 774 F.2d 235, 243 n. 10 (8th Cir.1985); *Berkey Photo, Inc. v. Eastman Kodak Co.,* 603 F.2d 263, 279 (2d Cir. 1979), *cert. denied,* 444 U.S. 1093, 100 S.Ct. 1061, 62 L.Ed.2d 783 (1980).

were entitled to recover regardless of any arson or misrepresentations of Paul's losses so long as no evidence linked them to the arson. This again confuses the defenses of arson and fraud. Aetna could have avoided liability by demonstrating that the arson was committed with the "knowledge, authorization or ratification" of Bennie and Anna. But it defended its failure to pay them by demonstrating that Bennie and Anna breached the terms of the insurance policy by "wilfully conceal[ing] or misrepresent[ing] any material fact or circumstance concerning [the] insurance or the subject thereof, or the interest of the insured therein, or [by] * * * any fraud or false swearing by the insured relating thereto." Joint Appendix at 388. The destruction of the property by arson and the amount, if any, of Paul's business interruption damages are material to the insurance contract as a whole. *Cf. Farm Bureau Co-operative Mill & Supply Inc. v. Blue Star Foods, Inc.*, 238 F.2d 326, 335 (8th Cir.1956) (principals may be liable for their agent's fraud if they "may be deemed to have approved or participated in it.") The instructions correctly permitted the jury to find for the defendant on this theory.[16]

### III.

Appellants raise various other objections to the instructions, but these warrant only brief attention.

■ One set of alleged errors relates to the instructions on scienter.[17] Appellants argue that the instructions did not require a sufficient degree of scienter and failed to conform to the appropriate Missouri Approved Instruction (MAI). Under Missouri law, "it is not necessary that it be shown that defendant had actual knowledge of the falsity of the facts stated by him. It is sufficient that he made the representations with the consciousness that he was without knowledge as to their truth or falsity, when, in fact, they were false." *Wilson v. Murch*, 354 S.W.2d 332, 339 (Mo.Ct.App. 1962). *See also Associated Photographers Inc. v. Aetna Casualty & Surety Co.*, 677 F.2d 1251, 1257 (8th Cir.1982) (noting instructions identical in relevant part to the instant ones). Appellant's argument that the instructions improperly hold the insured strictly liable for misstatements in proofs of loss is based on a misreading of the instructions themselves. The instructions required actual or constructive knowledge of the representation's falsity and the intent to deceive. Appellants supply no authority which supports their alternative contention that a claim of misrepresentation on an insurance claim requires a showing of actual knowledge. The instructions correctly required the jury to determine whether Vincent's representations were "willfully and fraudulently made with the intent to deceive the insurer." *Miller v. Great American Insurance Co.*, 61 S.W.2d 205, 208 (Mo.Ct.App.1933); *see also Gould v. M.F.A. Mutual Insurance Co.*, 331 S.W.2d 663, 669 (Mo.Ct.App.1960).

■ Appellants' argument that the instructions were also erroneous because they failed to mirror the language of MAI 23.05 is wholly without merit. It is "plain that a district court is not required to give the precise instruction set out in MAI, and that the grant and denial, particulars, and form of instructions are matters of procedure controlled by federal law and the Fed-

---

16. Appellants further argue that Aetna waived its misrepresentation defense by failing to demand individual proofs of loss from the parents. Appellants have not demonstrated that individual proofs of loss were necessary, however, and the record shows they authorized Vincent to file a single proof of loss for the entire family. Moreover, appellants failed to raise the issue of waiver until the next to last day of trial. The trial court found that the evidence did not justify ruling as a matter of law that the insurance company had waived appellants' proof of loss. Transcript, Volume VII at 91. The court invited appellants to submit a last-minute instruction on waiver, but the record does not indicate that they did so. Under the circumstances, appellants' waiver argument has no merit.

17. See notes 10 and 11 *supra*. Instructions 23, 27 and 29 require proof that Vincent knew that his representation was false or did not know whether it was true or false and that he intended to deceive the insurer. Instruction 21 requires proof that Vincent knew his representation was false and that he intended to deceive the insurer.

eral Rules of Civil Procedure." *Chohlis v. Cessna Aircraft Co.*, 760 F.2d 901, 904 (8th Cir.1985) (citations omitted). Federal courts are "not required to follow the exact wording of a particular state's suggested instructions, [but are] under an obligation to follow the substance of state law." *Morris v. Getscher*, 708 F.2d 1306, 1309 (8th Cir.1983). Moreover, MAI 23.05 is the instruction approved for fraud in the inducement. As appellants themselves note, a charge of a fraudulent proof of loss differs from one of fraud in the inducement, which requires, among other elements, reliance. Appellants' Brief at 27. *See, e.g., American Diver's Supply & Manufacturing Corp. v. Boltz*, 482 F.2d 795 (10th Cir.1973) (distinguishing insurance policy defense based on fraudulent claim from common law fraud); *Rayis v. Shelby Mutual Insurance Co.*, 80 Mich. App. 387, 264 N.W.2d 5 (1978) ("Fraudulent procurement has all the normal fraud elements, while fraudulent proof of loss, also called 'false swearing,' does not have justifiable reliance as one of its elements."). There is no basis for appellants' assertion that it was improper to assert alternative forms of scienter.

■ Another group of concerns, stated as objections to instructions, really questions the sufficiency of evidence. Appellants argue that Aetna failed to prove that Vincent had either actual or constructive knowledge that the fire had been intentionally set and that there was no evidence to suggest that Vincent materially exaggerated Paul's business interruption loss. We have carefully reviewed the seven days of testimony and find that sufficient evidence underlies the submissions to the jury.

There was evidence from which the jury could infer that Vincent knew that the fire was intentionally set because he was with Paul at the time of the fire or because he was involved with the arson. Witness Warrene saw two men leaving the building. He identified Paul as one, and his description of the other generally fits the description of Vincent. Vincent previously swore that he had not been at the restaurant on the date of the fire, but he testified at trial

that he arrived after the fire department. Vincent claimed that a caller had awakened him with the news of the fire, but he could not recall anything—even the gender—of the caller. In addition, there was substantial evidence that Vincent, who believed he was personally liable on a $50,000 loan to the restaurant, had a motive to destroy the unsuccessful restaurant. There was also evidence from which the jury might infer that Vincent Vitale did not know whether his assertions were true or false, including evidence suggesting that he had substantial reason to doubt his brother's account of the day of the fire.

Aetna not only presented substantial evidence that the claim for business interruption was grossly exaggerated, but Paul himself admitted at trial that his claim of earning $100 per day was false. Vincent testified that his lawyer completed the proof of loss and that he had "no idea" where the attorney had found that figure, but he had previously testified at deposition that Paul had given him the figure. Vincent subsequently admitted that he did not believe the figure was accurate.

### IV.

■ Appellants also object to the trial court's decisions on certain motions made before and during trial. They argue that the court erred in granting Aetna's motion for a directed verdict on the claims of vexatious refusal. In Missouri, insurers who refuse to pay claims "without reasonable cause" are liable for vexatious refusal. Mo.Rev.Stat. §§ 375.296 and 375.420 (1968 & 1986 Supp.). "The existence of a litigable issue, either factual or legal, does not preclude a vexatious penalty where there is evidence the insurer's attitude was vexatious and recalcitrant." *DeWitt v. American Family Mutual Insurance Co.*, 667 S.W.2d 700, 710 (Mo.1984) (citations omitted). *See also Still v. Travelers Indemnity Co.*, 374 S.W.2d 95, 103 (Mo.1963). Here there is no question that Aetna's refusal to pay was based on significant open questions of state law. The trial court found that it could not be said that the company was "unjustified or unreasonable or unfair in processing this claim the way they did." There had been no "demonstration of recal-

citrance on the part of [the] insurance company." Transcript, Volume IV, at 112. We have carefully reviewed the trial record. The evidence was insufficient to justify a finding of vexatious refusal to pay, and the trial court properly granted a directed verdict on those counts.

 Finally, the Vitales assert that the trial court erred in denying their motion for leave to amend their complaint to assert a cause of action for prima facie tort, based upon Aetna's cancellation of other policies. We may reverse such a ruling only for abuse of discretion. *Mercantile Trust Co. National Ass'n v. Inland Marine Products Corp.*, 542 F.2d 1010, 1012 (8th Cir. 1976). Appellants did not seek to amend their complaint in this manner until May 10, 1984, less than two months before trial. They state no reason for this delay. Moreover, the new claim might have required additional discovery on new factual allegations. The district court was well within its discretion in denying appellants' motion to amend.

After carefully reviewing the record and the parties' arguments, we conclude that the judgment should be affirmed in all respects.